UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In the Matter of a Subpoena to Testify at a Deposition in a Civil Action addressed to The Hon. Kirstjen Nielsen, former Secretary of Homeland Security | Case No. 4:23-mc-80280-KAW<br><br>**ORDER GRANTING IN PART MOTION TO QUASH SUBPOENA**<br><br>Re: Dkt. No. 1<br><br>**REDACTED VERSION** |

On October 23, 2023, Kirstjen Nielsen, former Secretary of the United States Department of Homeland Security, filed the instant motion to quash the deposition subpoena issued in *P.G. v. United States,* No. 21-cv-04457-KAW.  Originally filed in the U.S. District Court for the Southern District of California, the motion to quash was transferred to this district on October 27, 2023, and related to the underlying case.

On November 30, 2023, the Court held a hearing, and, after consideration of the arguments made in the extensive briefing and at oral argument, for the reasons set forth below, GRANTS IN PART the motion to quash, and MODIFIES the subpoena to require that it proceed by written question.

## I.    BACKGROUND

### A.    Family Separation Policy

On April 8, 2018, then-Attorney General Jefferson Sessions announced a "Zero Tolerance Policy" directing United States Attorney's Offices along the southwest border to prosecute certain immigration offenses. (*See* Compl., PG Dkt. No. 1 ¶ 45.) [1]  On April 23, 2018, the Policy was

---

[1] For ease of citation, documents filed on the docket in the underlying case, *P.G. v. United States,* No. 21-cv-04457-KAW, will be cited as "P.G. Dkt. No. __ ".

1   referred to then-Secretary of Homeland Security Kirstjen Nielsen. (Am. Resp. to Interrogatory No.

2   7, PG Dkt. No. 98-2 at 4.)

3        On April 24, 2018, Department of Homeland Security General Counsel John M. Mitnick

4   sent a memorandum to Secretary Nielsen, carbon copying her Chief of Staff, titled "Criminal

5   Prosecution of Aliens Who Entered Unlawfully: Legal Guidance on Potential Separation of

6   Family Members." (Mitnick Memo, Decl. of David J. Carroll ISO Reply, "Carroll Reply Decl.,"

7   Dkt. No. 45-1 ¶ 5, Ex. 5 at 3.[2])  The first paragraph of the memo is as follows:

> The Immigration and Nationality Act ("INA") authorizes the
> detention of aliens who have entered the United States
> until they can be removed from the United States.[1] Inadmissible
> aliens, including those who illegally enter the United States, are
> subject to removal and may also be subject to criminal penalties.[2] The
> Secretary of Homeland Security has broad legal authorities to carry
> out her responsibility to enforce the immigration laws.[3] **DHS could
> permissibly direct the separation of parents or legal guardians
> and minors so that the parent or legal guardian can be prosecuted
> pursuant to those authorities.**

13  (Mitnick Memo at 1) (emphasis added.)  The second paragraph provides that, "Generally,

14  individuals who have crossed the border illegally are subject to criminal penalties." (Mitnick

15  Memo at 2.)  It then proceeds to list statutes under which undocumented individuals may be

16  prosecuted. *Id.*  The third paragraph lists the three proposals that were being considered "in

17  coordination with the Department of Justice ("DOJ") … [to] increase prosecutions against aliens

18  who cross the border illegally." *Id.* "The third proposal would seek to refer all adults who commit

19  immigration violations for prosecution, including adults who are apprehended as part of a family

20  unit." *Id.*  "In referring all adults for such criminal prosecutions, it would be legally permissible to

21  separate minors from adult family members or other unrelated accompanying adults." *Id.*

22       On May 4, 2018, Secretary Nielsen signed the Referral Policy Memorandum, which

23  resulted in the separation of the immigrant parents and minor children under the auspices of

24  criminal prosecution pursuant to the Zero Tolerance Policy. (*See* Am. Resp. to Interrogatory No.

25  7, PG Dkt. No. 98-2 at 4.)

26

27  _____

28  [2] The first two pages of the exhibit are the FOIA cover letter disclosing the memo, so the Mitnick
    Memo starts of page 3. All further citations to the memo will be to the internal pagination, such
    that references to page 1 will be the first page of the memo, rather than page 3 of the exhibit.

United States District Court
Northern District of California

### B.    Pertinent Factual Background

Plaintiffs are three pairs of parents and children who fled violence in Central America to seek asylum in the United States only to be separated at Arizona's southern border in May 2018 pursuant to the Trump administration's Zero Tolerance Policy ("Policy"). (*See* Compl., P.G. Dkt. No. 1 ("PG Compl.") at ¶¶ 3, 4, 10-12, 41-57.)  Plaintiffs were separated for months, and they were only reunited after the U.S. District Court for the Southern District of California found that the Policy was unconstitutional and ordered the Government to reunify all separated family members within thirty days. Order Granting Pls.' Motion for Classwide Prelim. Inj., *Ms. L v. U.S. Immigr. & Customs Enf't ("Ms. L.")*, No. 3:18-cv-00428-DMS-MDD (S.D. Cal. June 26, 2018), ECF No. 83 ("Ms. L. Order").  Plaintiffs filed suit seeking relief under the Federal Tort Claims Act ("FTCA") for the Government's conduct. Plaintiffs' lawsuit is one of many similar actions brought by separated families, including two actions pending in the District of Arizona. *C.M. v. United States,* No. 19-cv-05217-PHX-SRB (D. Ariz.); *A.P.F. v. United States*, No. 20-cv-00065-PHX-SRB (D. Ariz.) (collectively "Arizona litigation").

Plaintiffs allege that the Government adopted the Policy with the intent to inflict harm on the parents and children it separated, hoping to deter would-be migrants by demonstrating that families seeking asylum in the United States would be met with cruelty. (PG Compl. ¶¶ 41-57; *see also* Am. Resp. to Interrogatory No. 7, PG Dkt. No. 98-2 at 4 (confirming that the Policy was meant to deter illegal immigration).)  Among other claims, Plaintiffs bring a claim for intentional infliction of emotional distress ("IIED"), which requires a showing that the Government acted "with the intent to cause emotional distress or with reckless disregard of the near-certainty that such distress would result." (PG Compl. ¶ 215.)

To develop facts to support their IIED claim and rebut the Government's defense based on the FTCA's "discretionary function exception," Plaintiffs served interrogatories seeking information about the Government decisionmakers' motives for adopting the Policy. (*See* PG Dkt. 98 at 3-5; Pls.' Opp'n at 4.)  The Government responded by identifying former Secretary Nielsen, former Attorney General Jefferson Sessions, and three sub-Cabinet officials as the five people whose intent it contended was relevant. *See ids.*  Relying on that representation, Plaintiffs obtained

deposition testimony from two of the three sub-Cabinet officials with purported "policy goal" knowledge but did not initially seek to depose Secretary Nielsen or Attorney General Sessions because the Government did not identify them, specifically, as critical to the Government's defense. *Ids.*

On September 8, 2023, the final day of fact discovery in the underlying case, the Government amended its relevant interrogatory response, asserting for the first time that "the goals that Defendant sought to achieve in adopting those policies are solely the goals for which former Attorney General Sessions and former Secretary Nielsen, respectively, adopted those policies." (Am. Resp. to Interrogatory No. 7, PG Dkt. No. 98-2 at 4; Pls.' Opp'n at 5.)

**C.    Procedural Background**

Due to the Government's reversal in position limiting the individuals whose intent mattered in implementing the Zero Tolerance Policy to Attorney General Sessions and Secretary Nielsen, the undersigned gave Plaintiffs leave to take their depositions. (9/25/23 Order, P.G. Dkt. No. 103 at 2.)

On October 13, 2023, counsel for Movant Secretary Nielsen accepted service of the subpoena. (*See* Mot., Dkt. No. 1 at 5.)  On October 23, 2023, Secretary Nielsen filed the instant motion to quash the subpoena in the United States District Court for the Southern District of California.  Secretary Nielsen also filed a motion to stay the deposition pending the resolution of the motion to quash. (Dkt. No. 2.)

On October 27, 2023, the Southern District magistrate judge found that exceptional circumstances existed to warrant the transfer of the pending motions to the Northern District of California pursuant to Federal Rule of Civil Procedure 45(f). (Transfer Order, Dkt. No. 19-1.)[3]

On October 31, 2023, Plaintiffs file an opposition to the motion to quash. (Pl.'s Opp'n, Dkt. No. 25.)  On November 2, 2023, the Court granted the motion to stay, and ordered Secretary Nielsen to file her reply by November 7, 2023. (Dkt. No. 34.)  On November 7, 2023, Secretary

---

[3] On November 13, 2023, Secretary Nielsen filed a motion for relief from the nondispositive transfer order, but the order was filed in this miscellaneous case rather than in the Southern District of California, so it was filed in the wrong court and terminated on that basis. (*See* Dkt. Nos. 57 & 58.)

United States District Court
Northern District of California

1  filed a reply. (Reply, Dkt. No. 45.)  On November 9, 2023, Plaintiffs filed an administrative

2  motion to supplement their opposition brief based on information obtained at the November 7,

3  2023 deposition of the Department of Homeland Security's Rule 30(b)(6) designee. (Dkt. No. 51

4  at 1.)  The Court granted the motion, and Plaintiffs filed their first supplemental brief on

5  November 16, 2023. (Pls.' Br., Dkt. No. 60.)  On November 13, 2023, Secretary Nielsen filed an

6  administrative motion to file a supplemental response, which was granted. (Dkt. Nos. 53 & 55.)

7  On November 17, 2023, Secretary Nielsen filed a first supplemental brief. (Movant's Br., Dkt. No.

8  63.)

9       On December 19, 2023, the Court issued an order requiring further supplemental briefing.

10 (Dkt. No. 74.)  On December 27, 2023, Plaintiffs filed a second supplemental brief. (Pls.' 2d Br.,

11 Dkt. No. 76.)  On January 3, 2024, Secretary Nielsen filed a second supplemental brief. (Movant's

12 2d Br., Dkt. No. 81.)

13                    **II.    LEGAL STANDARD**

14       Federal Rule of Civil Procedure 45 governs discovery propounded by subpoena.  A non-

15 party subject to a subpoena may file a motion to quash or modify the subpoena. Fed. R. Civ. P.

16 45(d)(3)(A).  A court must quash or modify a subpoena that subjects a person to undue burden.

17 Fed. R. Civ. P. 45(d)(3)(A)(iv).

18                    **III.    DISCUSSION**

19       *United States v. Morgan*, 313 U.S. 409 (1941), is considered the seminal authority on the

20 deposition of cabinet secretaries, but it "is not an absolute bar against the taking of such

21 depositions, and [] cabinet secretaries may be deposed under extraordinary circumstances." *In re*

22 *U.S. Dep't of Educ. (DeVos)*, 25 F.4th 692, 700-07 (9th Cir. 2022).  Absent such circumstances,

23 there is good reason to prevent the deposition of cabinet secretaries: (1) separation of powers, and

24 (2) the practical reality that cabinet secretaries face a potentially greater amount of litigation than

25 most other witnesses, and they cannot be expected to testify in every case involving their agency.

26 *See In re U.S. Dep't of Educ. (DeVos)*, 25 F.4th at 701-02.  In this circuit, former officials enjoy

27 the same protections. *Id.* at 706.

28       Even so, this "significant protection from depositions that cabinet secretaries enjoy does

United States District Court
Northern District of California

5

not mean that they are above the law." *In re U.S. Dep't of Educ. (DeVos)*, 25 F.4th at 701. As the Ninth Circuit observed, and the dissent emphasized, "the Supreme Court wrote, quoting James Madison, that the separation between the powers does not mean that the courts can never burden the executive." *Id.* (citing *Clinton v. Jones*, 520 U.S. 681, 703 (1997)).

### A.    Separation of Powers concerns

Secretary Nielsen argues that "compelling a Cabinet secretary to sit for a deposition to explain his or her decisions as a Principal Officer in the Executive Branch raises grave separation of powers concerns under the Constitution." (Mot. at 7.)  While the undersigned tends to generally agree, as explained below, this is not one of those situations.

*Morgan* and its progeny involved relatively minor policy decisions that certainly did not violate the most basic constitutional rights of those it impacted.  *Morgan* involved a decision by the Secretary of Agriculture setting maximum rates to be charged by market agencies at the Kansas City Stockyards, which was made after multiple, formal hearings. *United States v. Morgan*, 313 U.S. 409, 413, 422 (1941).  But there were multiple *Morgan* cases before the Supreme Court.  In an earlier case, which was quoted in part in the later, seminal decision, the Supreme Court held that "we agree with the Government's contention that it was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions **if he gave the hearing which the law required.**" *Morgan v. United State*s, 304 U.S. 1, 18, 58 S. Ct. 773, 776, 82 L. Ed. 1129 (1938) (emphasis added).  The later *Morgan* omitted the emphasized portion, which assumes that a formal and public administrative process occurred that led to a specific policy decision rendering the decision one that came from "collaborative instrumentalities of justice". *United States v. Morgan*, 313 U.S. 409, 422 (1941) (citing *United States v. Morgan,* 307 U.S. 183, 191 (1939)).  As the Supreme Court reasoned

> We are in the legislative realm of fixing rates. This is a task of striking a balance and reaching a judgment on factors beset with doubts and difficulties, uncertainty and speculation. On ultimate analysis the real question is whether the Secretary or a court should make an appraisal of elements having delusive certainty. Congress has put the responsibility on the Secretary and the Constitution does not deny the assignment.

*United States v. Morgan*, 313 U.S. 409, 417 (1941).  It should be no surprise that, absent

United States District Court
Northern District of California

1    unconstitutionality, the Supreme Court would not disturb the Secretary's determination of the

2    proper market rate—which was a power properly delegated by Congress—and it would find that

3    the Secretary should not have been subjected to deposition, when the agency amassed an

4    "enormous record" after holding formal proceedings involving the market agencies where an

5    examiner heard the evidence. *Id.* at 417, 422.

6         None of that happened here.  While the Secretary of Homeland Security may have broad

7    legal authority to enforce immigration laws, the family separation policy was not the result of

8    formal rule promulgation nor, based on the Government's amended interrogatory response, was it

9    the result of significant collaboration or formal proceeding where evidence was received from

10   those impacted by the Policy.  Rather, after relatively scant deliberation,[4] Secretary Nielsen

11   directed the separation of minor children from their families so that the parent or legal guardian

12   could be prosecuted[5] pursuant to the Zero Tolerance Policy. (*See* Am. Resp. to Interrogatory No.

13   7, PG Dkt. No. 98-2 at 4.)

14        Moreover, this case involves conduct that courts have found to likely be unconstitutional.

15   (*See* Ms. L. Order.)  As the *Ms. L.* court noted in finding that the plaintiff would likely succeed on

16   their due process claim, "although parents and children may lawfully be separated when the parent

17   is placed in criminal custody, the same general rule does not apply when a parent and child present

18   together lawfully at a port of entry seeking asylum." *Id.* at 13.  Moreover, in *Ms. L.,* the family

19   separation practice "resulted in the casual, if not deliberate, separation of families that lawfully

20   present at the port of entry, not just those who cross into the country illegally. … The

21   Government's treatment … is unlikely to pass constitutional muster." *Id.* at 14.  Thus, this case is

22   factually distinguishable from *Morgan, In re U.S. Department of Education (DeVos)* or any other

23   case in which the subpoena of a cabinet secretary or high ranking official was quashed, because it

24   raises a fundamental human rights issue that had such a high likelihood of violating the U.S.

25   Constitution that a district judge took the extraordinary measure to enter a preliminary injunction

26

27   [4] The DHS Referral Policy Memorandum, dated April 23, 2018, was signed by Secretary Nielsen
     on May 4, 2018. (Am. Resp. to Interrogatory No. 7, PG Dkt. No. 98-2 at 4.)

28   [5] As it turns out, minor children were also frequently separated from their parents or guardians,
     despite the latter not being criminally prosecuted.

United States District Court
Northern District of California

and ordered that the families be reunited.  In fact, the United States Government has condemned the Zero Tolerance Policy's resulting family separations as a "human tragedy." *Establishment of Interagency Task Force on the Reunification of Families*, Exec. Order 14,011, § 1, 86 Fed. Reg. 8273, 8273 (Feb. 5, 2021) [https://www.federalregister.gov/d/2021-02562].  Today, five years later, hundreds of children remain separated from their families, and they may never be reunited. If this situation is not one in which the judicial branch may properly review the Executive's policy decision making process, then we are not a coequal branch of government, and the Constitution's promise of checks and balances is merely illusory.

For these reasons, the Court finds that the prospect of ordering Secretary Nielsen to undergo deposition does not raise separation of powers concerns present in *Morgan* and its progeny.

**B.**     **Whether Extraordinary Circumstances Exist**

The Court will next address whether extraordinary circumstances exist to permit the deposition of Secretary Nielsen.  "[E]xtraordinary circumstances sufficient to justify the taking of a cabinet secretary's deposition exist when the party seeking the deposition can demonstrate: (1) a showing of agency bad faith; (2) the information sought from the secretary is essential to the case; and (3) the information sought from the secretary cannot be obtained in any other way." *In re U.S. Dep't of Educ. (DeVos)*, 25 F.4th 692, 702 (9th Cir. 2022).

**i.**     **Whether there has been a showing of agency bad faith.**

"A showing of bad faith is a threshold issue to justifying taking a cabinet secretary's deposition." *In re U.S. Department of Education (DeVos)*, 25 F.4th at 702.  Secretary Nielsen argues that Plaintiffs have failed to establish bad faith. (Mot. at 10.)  Specifically, the Secretary contends that Plaintiffs' position is that all that is required to "establish 'bad faith' sufficient to depose a Cabinet secretary is allege a substantive constitutional violation in a policy that was adopted." (Mot. at 11.)  As Secretary Nielsen acknowledges, *DeVos* requires an evidence-based showing of bad faith. (Mot. at 12 (citing *In re U.S. Dep't of Educ.*, 25 F.4th at 702-703).)

As an initial matter, the Secretary argues in reply that the undersigned did not make a finding that the Mitnick Memo was evidence of unlawful intent. (Reply at 4-5 n. 5.)  In the prior

order, the undersigned stated that "while the Court may agree that the Mitnick Memo suggests that family separation was a policy goal of the Zero Tolerance Policy, rather than an unfortunate byproduct, the undersigned cannot find that the memo's disclosure constitutes a subject matter waiver over the related communications." (P.G. Dkt. No. 113 at 3-4.)  The order resolved a dispute regarding whether the disclosure of the Mitnick memo resulted in the waiver of privilege over related documents, rather than addressing whether the Mitnick Memo was evidence of bad faith or unlawfulness. *See id.*  In an effort to disabuse all involved of any assumptions to the contrary, the Court finds that the Mitnick Memo is evidence of bad faith, in that it very clearly advised Secretary Nielsen that "DHS could permissibly direct the separation of parents or legal guardians and minors so that the parent or legal guardian can be prosecuted pursuant to those authorities." (Mitnick Memo at 1.)

Moreover, Plaintiffs satisfactorily cite to several other pieces of evidence that show that the agency acted in bad faith. (*See* Pls.' Opp'n at 8-10.)  As discussed above, in *Ms. L.,* the district court found that the practice of separating families "resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry," which expanded the prior separation policy "beyond its lawful reach". (Ms. L. Order at 14.)  The Court acknowledged that

> asylum seekers like Ms. L. and many other class members may be fleeing persecution and are entitled to careful consideration by government officials. Particularly so if they have a credible fear of persecution. We are a country of laws, and of compassion. We have plainly stated our intent to treat refugees with an ordered process, and benevolence, by codifying principles of asylum. *See, e.g.,* The Refugee Act, PL 96-212, 94 Stat. 102 (1980). The Government's treatment of Ms. L. and other similarly situated class members does not meet this standard, and it is unlikely to pass constitutional muster.

*Id.*

Additionally, in denying the Government's motion for summary judgment, the district court in the Arizona litigation found that "evidence suggests an inconsistency between the pronounced purpose of the Referral Policy—to refer all amenable adults for prosecution—and the Policymakers' underlying intent." Order, *C.M. v. United States,* No. 19-cv-05217-PHX (D. Ariz. Oct. 24, 2023), ECF No. 434 at 20.  There, evidence was also offered to show "that the Policymakers intended to separate families irrespective of whether the parents were ever

prosecuted to deter other potential migrants from entering the United States." *Id.*  Indeed, in those cases and this one, families were separated despite the parents not being prosecuted. *See id.* As the Arizona court found, "[t]his could serve no compelling or legitimate government interest." *Id.*

Thus, given the abundance of evidence produced, in this case and in related litigation, indicating that the actual intent of the Zero Tolerance Policy was to separate families to deter illegal immigration, the bad faith element is satisfied.  Indeed, it was well documented by the media that the Zero Tolerance Policy resulted in separated children being placed into literal cages, where they were forced to sleep on the floor with Mylar blankets and denied the most basic of care.  When these atrocities were being inflicted on children, Secretary Nielsen was on record saying that the children were well cared for, and she repeatedly denied that they were being housed in cages despite media coverage showing the contrary. *See, e.g.,* Rosie Gray, *The Trump Administration's Shifting Story on Family Separations,* The Atlantic, Jun. 18, 2018, https://www.theatlantic.com/politics/archive/2018/06/the-trump-administrations-shifting-story-on-family-separations/563111/ [https://perma.cc/GP2C-NF66]; *cf. See The Way Forward on Border Security: Hearing Before the H. Comm. on Homeland Security*, 116th Cong. 116-4 (Mar. 6, 2019) (Testimony of Secretary Nielsen), O'Brien Decl., Ex. 7 at 47-49 ("March 6, 2019 H. Comm. Hearing Test.").

Accordingly, the Court finds that Plaintiffs have made a showing of bad faith.

### ii.    Whether the information sought is essential to the case

Plaintiffs contend that the Government's litigation position makes Secretary Nielsen's testimony essential to the case. (Pls.' Opp'n at 10.)  Here, after Plaintiffs had obtained testimony and developed evidence from other, non-Cabinet-level decisionmakers that the Government had identified, the Government changed course to claim that only former Secretary Nielsen's and former Attorney General Sessions's intent mattered for purposes of establishing its liability under the FTCA.  Plaintiffs allege that the prosecution policy was pretext to separate undocumented immigrants from their minor children, and, based on the Government's amended interrogatory response, Secretary Nielsen's intent is essential to this case to prove the constitutional and the intentional infliction of emotional distress claims because she was the ultimate decisionmaker.

United States District Court
Northern District of California

1  (*See* Pls.' Opp'n at 4-5, 10-11.)  In the Arizona litigation, the Government took the position on

2  summary judgment that Plaintiffs needed to provide admissible evidence of Secretary Nielsen's

3  intent, and that testimony from other sources were not an adequate substitute for the ultimate

4  decisionmaker's. *Id.* at 5, 15.

5        This situation stands in stark contrast with *DeVos*, in which neither the plaintiffs nor the

6  Government posited that the secretary's testimony was essential to the case. *See In re U.S. Dep't of*

7  *Educ (DeVos)*, 25 F.4th at 704.  In fact, there, plaintiffs' counsel "even acknowledged that

8  plaintiffs likely could win relief on the existing record…." *Id.*  Here, however, Plaintiffs expect the

9  Government to raise the discretionary function exception defense in response to the constitutional

10  claims, and intent is an essential element of the IIED claim, rendering Secretary Nielsen's intent

11  essential. (*See* Pls.' Opp'n at 4.)

12          a.  <u>Prior testimony is insufficient</u>

13        Next, Secretary Nielsen argues she has already been questioned under oath and testified

14  regarding her intent before Congress. (Mot. at 17-18; Reply at 10.)  Secretary Nielsen's March 6,

15  2019 testimony before the House of Representatives' Committee on Homeland Security is hardly

16  exhaustive or enlightening.  The Court notes that—even after the media coverage showed the

17  world that children were being kept in cages, which led to public pressure to suspend the

18  separation policy—Secretary Nielsen refused to admit that what the public saw were cages.

19  (March 6, 2019 H. Comm. Hearing Test. at 47-49.)  Moreover, Secretary Nielsen argues that she

20  already answered the question of intent when she testified before Congress. (Reply at 10.)

21  Secretary Nielsen was asked, "Did you initiate the separation of families for the express purpose

22  of deterring families from coming to the United States?" (March 6, 2019 H. Comm. Hearing Test.

23  at 46.)  To which she replied, "No. I did not. Again, the whole purpose of that was to increase

24  consequences for those who choose to break the law. That is a bedrock of our criminal- as you

25  know- the way that our criminal system works." *Id.* Secretary Nielsen then clarified that, "The

26  consequence of any adult going to jail in this country is they are separated from their child. That

27  wasn't the point of it. The point was to increase prosecutions for those breaking the law and not

28  exempt any class of aliens." (Reply at 10 (quoting March 6, 2019 Committee Test. at 48).)

United States District Court
Northern District of California

1    There are multiple reasons why the Secretary's prior testimony is inadequate. First, it may

2    be a matter of semantics, but the use of the word "express" in the question she answered refers to

3    the publicly stated reason for the Policy, rather than the actual purpose. Second, Secretary

4    Nielsen's response is a gross oversimplification of how the American criminal justice system

5    treats minors when their parent or guardian is incarcerated. While the system is far from perfect,

6    most American children are placed with a family member, and those without an appropriate

7    familial placement are put in foster care. Shaila Dewan, *Family Separation: It's a Problem for*

8    *U.S. Citizens, Too,* N.Y. Times, Jun. 22, 2018, https://www.nytimes.com/2018/06/22/us/family-

9    separation-americans-prison-jail.html [https://perma.cc/6QQK-EEPF]. In short, American

10   children separated due to incarceration can be located by the Government; they are not lost. The

11   arrested parent still retains parental rights; and reunification is generally the goal.

12   Third, the family separations that occurred in connection with the Zero Tolerance Policy

13   were very different than separations due to "domestic" criminal prosecution. As was keenly

14   observed by the *Ms. L.* court, the many families that presented at the port of entry to seek lawful

15   asylum were not breaking the law. (Ms. L. Order at 13-14.) Also, as was the case with the three

16   adult plaintiffs in this case, some parents were in custody for short periods of time or were not

17   prosecuted at all. As a result, the parents were only in federal custody long enough for their

18   children to be placed in the custody of U.S. Department of Health and Human Services' Office of

19   Refugee Resettlement ("ORR") resulting in prolonged separation for ostensibly no reason. The

20   undersigned notes that the *Ms. L.* preliminary injunction order, requiring the reunification of

21   parents and children separated by the Zero Tolerance Policy, was issued almost nine months

22   before Secretary Nielsen testified before Congress, so she should have known that her explanation

23   was not adequate and was, in fact, inaccurate. Congressional hearings do not provide the same

24   opportunity as a deposition to cross-examine witnesses, so Secretary Nielsen was not held

25   accountable to fully answer the questions asked. (*See* March 6, 2019 H. Comm. Hearing Test. at

26   43-49.)

27   Furthermore, to the extent that Secretary Nielsen testified that she "had not been directed"

28   to separate parents from children to deter immigration, this does not explain her intent in enacting

1    the Policy. (*See* Reply at 10 n. 10.)

2          For these reasons, the undersigned finds that the information sought is essential to the case,

3    and that the prior testimony does not sufficiently explain Secretary Nielsen's intent at the time the

4    Policy was implemented.

5              **iii.    Whether the information may be obtained in another way**

6          To demonstrate that the information sought is not obtainable any other way, Plaintiffs must

7    show that they have exhausted "all reasonable alternative sources." *See In re U.S. Dep't of Educ*

8    *(DeVos)*, 25 F.4th at 704.  Secretary Nielsen argues that Plaintiffs have made no effort to do so.

9    (Mot. at 18.)  To the extent that the Secretary argues that her prior congressional testimony and

10   record evidence satisfies Plaintiffs' needs, the Court has found that it does not. *See* discussion,

11   *supra,* Part III.B.ii.a.

12         In reply, Secretary Nielsen argues that the undersigned should quash the instant subpoena

13   for the same reasons the United States District Court for the Southern District of Alabama quashed

14   the subpoena of former Attorney General Sessions that was served in the underlying action.

15   (Reply at 10.)  The Court will first address the Sessions order before addressing the other *DeVos*

16   considerations.

17             a.   The Alabama order is not persuasive, because the identified individuals do not
18                  have knowledge of Secretary Nielsen's intent.

19         In parallel proceedings to this motion, on November 6, 2023, the district court quashed the

20   Sessions subpoena on the grounds that Plaintiffs had not demonstrated the existence of

21   "extraordinary circumstances or special need." (*See* Order, *In the Matter of a Subpoena to Testify*

22   *at a Deposition in a Civil Action for Jefferson B. Sessions,* No. 23-mc-00016-JB-B (S.D. Ala.

23   Nov. 6, 2023), Carroll Reply Decl., ¶ 1, Ex. 1 at 4 ("Sessions Order").)  There, the district court

24   found that Plaintiffs failed to show (1) that Sessions's testimony was essential to the case and (2)

25   that the information could not be obtained by any other means. (*See* Sessions Order at 4.)  The

26   district court observed that, after providing that the goals of Nielsen and Sessions in adopting the

27   Policy were solely theirs, the Government's amended interrogatory response identified six

28   individuals "with knowledge about the Policy goals identified above." *Id.* at 5.  Those individuals

United States District Court
Northern District of California

named were Sessions, Nielsen, Thomas Homan (Former Acting Director, ICE), Kevin McAleenan (Former Commissioner, Customs and Border Protection ("CBP")), Carla Provost (Former Chief, CBP), and Gene Hamilton (Former Counselor to the Attorney General, DOJ). (Am. Resp. to Interrogatory No. 7 at 5.)  The district court then found that, while Plaintiffs obtained copies of the depositions of two of the identified individuals taken in a similar case, Plaintiffs "made no showing that the testimony of those individuals was somehow insufficient to prove the necessary intent for this case." (Sessions Order at 5.)  Furthermore, the district court observed that "Plaintiffs have not attempted to depose the other two non-cabinet officials." *Id.*  As a result of Plaintiffs' failure to exhaust the witnesses identified as having relevant information, the district court found that they had failed to both demonstrate that Sessions's testimony was essential to the case and that any information possessed by Sessions was unobtainable by any other means. *Id.*

Setting aside that the Sessions court was not bound by the Ninth Circuit's *DeVos* decision, the undersigned is not persuaded by the district court's rationale, because, here, Plaintiffs have demonstrated a far more robust discovery record.  First, one day after the issuance of the Sessions order, Plaintiffs took the deposition of the Department of Homeland Security's Rule 30(b)(6) deponent, who could not answer questions regarding the Secretary's intent. *See* discussion, *infra,* Part III.B.iii.b.

Second, Plaintiffs have explained how they had reasonably exhausted discovery of the four non-cabinet officials listed in the amended response. At the hearing, Plaintiffs explained that they used the depositions of Homan and McAleenan taken in the Arizona litigation, because the Government took the position that they could not be deposed again. (11/30/23 Hearing Tr., Dkt. No. 69 at 19:9-13.)  Regardless of the propriety of the Government's position regarding depositions, the deposition transcripts indicate that these individuals were unable to testify regarding Nielsen's intent and mental state in approving the Policy. (*See* Homan Tr., Decl. of Brook Dooley ISO Pls.' 2d Suppl. Br., "2d Suppl. Dooley Decl.," Dkt. No. 76-1 ¶ 2, Ex. A at 58:22-25; McAleenan Tr., Decl. of Brook Dooley, "Dooley Decl.," Dkt. No. 25-1 ¶ 19, Ex. R at 298:15-18.)  In response to being asked ████████████████████████████████████ ████, McAleenan testified that, █████████████████████████████████████████████

14

1    ████████████████████████████ (McAleenan Tr. at 298:15-18.)  Similarly,

2    Homan testified that, ██████████████████████████████

3    ███████████ (Homan Tr. at 54:25-55:2.)  Homan further testified that, ████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████ (Homan Tr. at 58:22-25.)

6    The Court is not persuaded by Secretary Nielsen's arguments in her second supplemental brief that

7    Homan's testimony undermines Plaintiffs' arguments, because, ██████████████████

8    ████████████████████████████████████████████

9    ███████████████████ (See Movant's 2d Br. at 2.)

10        Plaintiffs also obtained a copy of the deposition of Gene Hamilton, which was taken in the

11   Arizona litigation. (11/30/23 Hearing Tr. at 19:23-25; Pls.' Hamilton Tr., 2d Suppl. Dooley Decl.

12   ¶ 9, Ex. H.)  Hamilton was counselor to Sessions, rather than Secretary Nielsen, so he did not have

13   insight as to the Secretary's thinking regarding the Referral Memo, and his testimony indicates

14   that he does not even have a clear recollection of the meetings held with Nielsen. (See Pls.'

15   Hamilton Tr. at 236-240, 295-300, 296:5-297:4.)[6]  Given these circumstances, the Court is

16   unpersuaded by the Secretary's arguments that he could be a reasonable source of evidence

17   regarding her intent. (See Movant's 2d Br. at 3.)

18        As to Carla Provost, Plaintiffs explained at the hearing that she was not deposed because

19   there was testimony from several other CBP officials, and the Government provided a written

20   response with a list of individuals involved in the drafting, proposing or approving the Policy at

21   issue, and Ms. Provost was not included, such that she is not a reasonable alternative source of

22   evidence. (11/30/23 Hearing Tr. at 20:12-21:8; Def.'s Written Resp. to DHS 30(b)(6) Topic 1, 2d

23   Dooley Decl. ¶ 6, Ex. E at 2-3.)  Furthermore, ████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████

26

27   ───────────────────────

28   [6] The Court notes that Secretary Nielsen concedes that Mr. Hamilton's name was added the to the
     Government's interrogatory response on the last day of discovery. (See Mot. at 3-4.)  Thus,
     Plaintiffs had no reason to depose him prior to the close of fact discovery.

United States District Court
Northern District of California

1   ████████████ 2d Suppl. Dooley Decl. ¶ 7, Ex. F at 274:4-25; 276:15-18, 277:1-22.)  To the

2   extent that the Secretary argues that Provost is able to testify regarding the goals of the Policy, it

3   defies reason that she would be privy to knowledge of the Secretary's intent that others more

4   intimately involved in briefing Secretary Nielsen lacked. (*See* Movant's 2d Br. at 3.)

5        Secretary Nielsen's apparent position at the hearing that reasonable exhaustion requires

6   that the deponents be directly asked if they knew the Secretary's intent or rationale in signing the

7   memo is unreasonable in light of their testimony that they could not testify to her thought process.

8   (11/30/23 Hearing Tr. at 15:7-11.)  Reasonable exhaustion should not require magic words when

9   the deposition testimony clearly indicates that the deponents most likely to possess this

10   information all testified that they ultimately do not know why the Secretary chose option 3.

11        Thus, unlike the record presented in connection with the Sessions motion to quash,

12   Plaintiffs have provided sufficient evidence to demonstrate that they have reasonably sought

13   information from the individuals listed in the amended interrogatory response and could not obtain

14   the information required to effectively prosecute their case. *See In re U.S. Dep't of Educ. (DeVos)*,

15   25 F.4th at 704.  For that reason, this court is not persuaded by the order quashing the subpoena of

16   Attorney General Sessions and declines to adopt that court's rationale.

17        b.   Plaintiffs performed more discovery than the *DeVos plaintiffs.*

18        In *DeVos,* the Ninth Circuit found that the plaintiffs' failure to take a Rule 30(b)(6)

19   deposition of the U.S. Department of Education and to use their interrogatories to attempt to

20   ascertain the information sought constituted a failure to exhaust all reasonable alternatives. *In re*

21   *U.S. Dep't of Educ (DeVos)*, 25 F.4th at 704.  The Secretary argues that Plaintiffs have ignored

22   less intrusive means of discovery, including interrogatories or a Rule 30(b)(6) deposition. (Reply

23   at 18 (citing *In re U.S. Dep't of Educ (DeVos)*, 25 F.4th at 704).)  This representation is inaccurate.

24   First, as discussed above, there is no public record indicating what Secretary Nielsen's actual

25   intent was. *See In re U.S. Dep't of Educ (DeVos)*, 25 F.4th at 704 (citing *In rep McCarthy,* 636 F.

26   App'x 142, 144 (4th Cir. 2015)).  Second, unlike *DeVos,* Plaintiffs have used interrogatories, and

27   taken numerous depositions, including the Rule 30(b)(6) deposition of the Department of

28   Homeland Security designee, and did not obtain the information sought. (*See* Pls.' Br. at 1.)

United States District Court
Northern District of California

16

United States District Court
Northern District of California

On November 7, 2023, Plaintiffs deposed the DHS Rule 30(b)(6) designee. (Pls.' Br. at 1.) Despite having thoroughly prepared for deposition, the DHS witness could not answer questions about Secretary Nielsen's intent in adopting and continuing the Policy or what information she had before her on May 4, 2018, when she accepted the "Option 3 recommendation" and directed Border Patrol to refer immigrant parents for prosecution. *Id.* (citing Pls.' Opp'n at 3.)  Plaintiffs cite to two documents that would support their contention of pretext if only they had confirmation that Secretary Nielsen reviewed them prior to adopting option 3. (Pls.' Br. at 1-3.)  The first was the "Nealon Memo," which was sent to then-Acting DHS Secretary Elaine Duke in October 2017, and, if seen, would have put Secretary Nielsen on notice ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████ (*See* Pls.' Br. at 1; Nealon Memo, Suppl. Decl. of Travis Silva, "Suppl. Silva Decl., Dkt. No. 60-1 ¶ 5, Ex. B at 1-2 (direct quote).)  The second was the "Unaccompanied Alien Children ("UAC") Options Memo," dated December 16, 2017, which ████████████████████████████ ████████████████████████████████████████████████████████████ *Id.* at 2 (citing UAC Options Memo, Silva Suppl. Decl. ¶ 7, Ex. D at 1.)  Plaintiffs contend that if Secretary Nielsen was privy to the UAC Options Memo, she would have been on notice that the actual purpose of the Policy was to separate families. (Pls.' Br. at 2.)  In opposition, the Secretary argues that the two documents were prepared for DHS, including one from before Secretary Nielsen was appointed, ██████████████████████████████████, and that she ultimately approved a policy that focused on prosecution. (Movant's Br. at 2.)  The Secretary contends that, to the extent that Plaintiffs want to know whether she reviewed certain documents, they can seek discovery from those individuals who briefed her. (Movant's Br. at 4-5.) These individuals included ████████████████████████████. *Id.* at 5.  Since Plaintiffs did not seek that discovery, ████████████████████████████████████████████ ████████████████████, Plaintiffs have not shown that they have exhausted all alternatives. *Id.* Secretary Nielsen is overstating the requirement of *DeVos,* which only requires the "[e]xhaustion of all reasonable alternative sources." *In re U.S. Dep't of Educ. (DeVos)*, 25 F.4th at 704.  While

United States District Court
Northern District of California

the individuals who briefed her may be able to testify to Secretary Nielsen being provided certain briefing materials, they are unlikely to be able to testify to which documents she relied on when approving the Policy.  We know that two of those individuals testified that they did not know what the Secretary's reasoning was in approving option 3, and the third was not listed by the Government as an individual with knowledge in the amended interrogatory. *See* discussion, *supra,* Part III.B.iii.a.  As a result, the Court finds that requiring Plaintiffs to take the depositions of those employees to ask which documents Secretary Nielsen actually read is unlikely to result in the evidence to which Plaintiffs are entitled.

Additionally, Plaintiffs contend that Secretary Nielsen has made retrospective statements about the Policy, her knowledge at the time of the Policy's implementation, and her intent. (Pls.' Opp'n at 14, nn. 6-7 (citing Caitlin Dickerson, *The Secret History of Family Separation*, THE ATLANTIC (August 7, 2022), [https://perma.cc/U3S5-Z3X5].)  Secretary Nielsen apparently told a reporter that she did not want to adopt option 3, because she doubted that DHS had adequate resources for implementation. (Pls.' Br. at 3 (citing *The Secret History of Family Separation* at 45).)  Relatedly, Plaintiffs contend that the DHS designee was unable to testify as to whether Secretary Nielsen had ████████████████████████████████████████ ████████████████████████ (Pls.' Br. at 3 (citing DHS Rule 30(b)(6) Dep., Suppl. Decl. of Travis Silva, Dkt. No. 50, Ex. A.)  Plaintiffs contend that this is relevant to determining whether Defendant adopted the Policy with reckless disregard to its consequences, and that Secretary Nielsen is the only person who can confirm or deny her prior statements, her consultations with other government agencies, and whether she received and considered information about ORR's operational capacity before adopting the option 3 recommendation. (Pls.' Br. at 3-4.)

Furthermore, Plaintiffs argue that DHS could not confirm whether, at the time option 3 was adopted, Secretary Nielsen intended for Border Patrol to separate immigrant children from their parents when the parents were not referred for prosecution. (Pls.' Br. at 4.)  Plaintiffs contend that Border Patrol referred parents for prosecution, purportedly to justify family separation, even when it was obvious that DOJ was receiving more referrals than they could prosecute. *Id.*  Indeed, two of the sets of parents in this case were never prosecuted at all, and yet the families were still

1   separated. *Id.* Plaintiffs contend that, if Secretary Nielsen knew that Border Patrol was making

2   prosecution referrals knowing that most of them would never result in prosecution, that knowledge

3   would support Plaintiffs' argument that the "prosecution policy" was pretextual. *Id.*

4        The Secretary argues that Plaintiffs have made no showing that the persons who had

5   knowledge about briefing Secretary Nielsen on the decision could not answer that question.

6   (Movant's Br. at 5.)  The Secretary further contends that the ███████████████████

7   ██████████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████████████

9   ████████████████████████████████████ *Id.* at 5 ██████████████████

10  ████████████  Suppl. Decl. of David J. Carroll, "Suppl. Carroll Decl.," Dkt. No. 63-1 ¶ 2, Ex. A at

11  214:8-13.)  Thus, Secretary Nielsen argues that while Plaintiffs may not like the answer given, it is

12  not accurate to say that DHS could not explain whether the Policy took into account the limits of

13  the U.S. Attorney's Office's prosecution capacity. *Id.*  The undersigned disagrees. ██████████

14  ██████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████████

17  ███████████████████████████████  As a result, the undersigned finds that the testimony

18  to which the Secretary cites does not sufficiently address her intent.

19       Accordingly, the undersigned finds that the information sought—Secretary Nielsen's intent

20  in implementing the Family Separation Policy— is generally not obtainable in any other way. *See*

21  *In re U.S. Dep't of Educ (DeVos)*, 25 F.4th at 704.

### iv.    Modification is appropriate.

23       While the Court finds that the *DeVos* test is satisfied, the undersigned recognizes that no

24  cabinet secretary has been compelled to undergo oral deposition in more than 80 years, and that

25  every Court of Appeals that has been petitioned by writ of mandamus to quash such a subpoena

26  has elected to do so.  Federal Rule of Civil Procedure 45(d)(3) permits the court to quash or

27  modify a subpoena that would subject a person to an undue burden.  The Court finds that it is an

28  undue burden for Secretary Nielsen to be deposed in a way that a non-party witness would be

deposed, which would require that she testify for up to 7 hours and appear in-person. *See* Fed. R. Civ. P. 30.

In recognition of this extraordinary situation, the Court finds it appropriate to modify the subpoena and require that the deposition proceed by written question, pursuant to Federal Rule of Civil Procedure 31. As Secretary Nielsen acknowledged at the hearing, deposition by written question is a less intrusive means of discovery than oral deposition, and it represents an "incremental approach" that is "more respectful of the separation of powers concerns involved here." (11/30/23 Hearing Tr. at 53:24-54:15.) To further reduce the burden on Secretary Nielsen, Plaintiffs are limited to 25 direct questions, including all discrete subparts. The Government is limited to 25 cross-questions, including all discrete subparts. The parties are each limited to 10 redirect and recross-questions. The parties should consider her prior testimony and public statements when fashioning their questions. The Court trusts that Plaintiffs and the United States will work together to ensure that Secretary Nielsen's discovery burden is minimized to the extent possible.

## IV.   CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART Secretary Nielsen's motion to quash and MODIFIES the subpoena to be by written question pursuant to Federal Rule of Civil Procedure 31. The parties shall immediately meet and confer regarding who will serve as the deposing officer pursuant to Rule 31(a)(3). Within 14 days of this order, Plaintiffs are directed to serve an amended notice on Secretary Nielsen and the parties in the underlying litigation, *P.G. v. United States,* 21-cv-04457-KAW, and in accordance with the procedures set forth in Rule 31. In light of the current case schedule, the Court finds good cause to alter the timing of additional questions, as set forth in Rule 31(a)(5) as follows: cross-questions shall be provided within 7 days after being served with the notice and direct questions; redirect questions, within 4 days after being served with cross-questions; and recross-questions, within 4 days after being served with redirect questions.

Secretary Nielsen shall undergo written deposition within 7 days of the delivery of all questions to the officer in accordance with Rule 31(b). The officer shall then have 3 days to

United States District Court
Northern District of California

prepare, certify, and send it to the noticing party, as required by Rule 31(b).

Should Plaintiffs find the Secretary's written responses inadequate, the parties are directed to meet and confer and either agree to a limited oral deposition or file a joint discovery letter consistent with the undersigned's standing order.[7]  Since the Court has found that the *DeVos* test has been satisfied, in the event that the parties require court intervention, they need only address the sufficiency of the written deposition testimony, what testimony Plaintiffs believe they are missing, and why it can only be obtained by oral deposition.  The parties must also include their respective proposals regarding time limits.

IT IS SO ORDERED.

Dated: January 24, 2024

KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California

---

[7] Available at: https://cand.uscourts.gov/judges/westmore-kandis-a-kaw/